IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 30, 2019 Session

## STATE OF TENNESSEE v. JONATHAN ADDAIR

**Appeal from the Criminal Court for Sullivan County**
**No. S67-410  James F. Goodwin, Jr., Judge**

_____

### No. E2018-00799-CCA-R3-CD

_____

Following a bench trial, the trial court convicted the Defendant, Jonathan Addair, of child abuse and domestic assault. The trial court merged the domestic assault conviction into the child abuse conviction and sentenced the Defendant to serve three years and six months in confinement. On appeal the Defendant asserts the evidence is insufficient to support his conviction for child abuse, and the trial court's sentence is excessive. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Jonathan Sevier Cave, Greeneville, Tennessee, for the appellant, Jonathan Wayne Addair.

Herbert H. Slatery III, Attorney General and Reporter; Barry P. Staubus, District Attorney General; and Emily M. Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

This case arises from a physical interaction related to discipline between the Defendant and his three-year-old daughter, M.A.[1] Consequently, a Sullivan County grand jury indicted the Defendant for child abuse and domestic assault. The Defendant waived his right to a jury trial and elected to have a bench trial. At the bench trial on the charges, the parties presented the following evidence: Kasandra Berry testified that she

---

[1] It is the policy of this court to refer to minors by their initials only.

was in a "dating relationship" with the Defendant in September 2016, and alternated her residence between the Defendant's trailer and her aunt's home.

On the night of September 24, 2016, Ms. Berry was at the Defendant's residence in Sullivan County with her two minor children. Ms. Berry recalled that the Defendant's two minor children were also present. The children had been in "[t]he boys' room at the far end of the trailer" jumping. The Defendant, who had been in his bedroom, went into the room and told the children to stop jumping. The Defendant returned to his bedroom where he could observe the children through a video camera baby monitor. The Defendant's daughter, M.A., continued jumping. Ms. Berry was seated in the living room but followed the Defendant as he "stormed" through the trailer to the boys' room. The Defendant was "screaming" and then picked M.A. up and held her against the wall by her throat. As he held her by the throat, the Defendant continued "scream[ing]" at M.A., demanding she stop jumping on the bed. He then put M.A. in her bedroom.

Ms. Berry testified that she witnessed the entire interaction and recorded a portion of it on her cell phone. She said that she first made sure the flash was turned off on her camera phone so that the Defendant would not know she was recording him. According to Ms. Berry, after the Defendant carried M.A. to her bedroom, he returned to the boys' room and "yelled at the other three children" before going back to his bedroom. Once the Defendant had returned to his room, Ms. Berry went to M.A.'s bedroom to check on her. She recalled that M.A. was crying and stated that she was scared. Ms. Berry said that, while comforting M.A., she did not notice any marks on M.A., but explained that it was dark in the room.

Ms. Berry testified that her cell phone at the time was a DROID Mini. While she no longer owned that phone, she had saved the recording to a "Keepsafe app." Ms. Berry used the password-protected app for storage and confirmed that she had not shared the password for the account with anyone. Ms. Berry explained her reasoning for moving the recording to a secured location as follows:

> Because [the Defendant] would go through my phone, look at things, and we would argue. So when I was worried where there was arguments that night, that [the Defendant] would go through it and see the video and then it would just be worse. So I put it in there so no one could see it.

Ms. Berry confirmed that she had not altered the recording in any way.

Ms. Berry testified that she did not report the incident to the police for several days. She explained that she did not do so immediately because she and all four children were at the Defendant's trailer. The Defendant went to North Carolina for work the day

after the incident, and the children went to other residences. Ms. Berry stated that, because of this incident and other issues, she planned to leave the Defendant but wanted to first retrieve her belongings from the trailer. Additionally, she did not believe the police would go to another state to retrieve the Defendant, so she waited until he returned. On the night he called to tell her he was at home, she notified the police of the incident with M.A.

Ms. Berry testified that she had reviewed a copy of the recording she had given to the police and confirmed that it was an accurate depiction of what had occurred. She stated that the recording had not been altered. The State played the recording for the trial court. Ms. Berry identified the man in the video as the Defendant and the voice heard yelling and cursing at the children as the Defendant's voice. The video recording begins with the Defendant pinning M.A., approximately four to five feet above the ground, against the wall by her neck while he yells at her. M.A.'s face is bright red, she is crying loudly, and her face is pinched and contorted. He then carries her down the hall and puts her in her bedroom. He returns to the boys' room and yells and curses at the remaining children. The Defendant can be heard saying, "I'm in a goddamn f**king mood to put some a**es on the floor!"

Ms. Berry testified that she was in the room before the recording began and watched the Defendant pick up M.A. from the ground and pin her against the wall at eye level with him. She began recording the incident after M.A. was already pinned to the wall so the recording did not capture the entirety of the incident. Ms. Berry witnessed the Defendant's right hand around the victim's throat but was unsure of the placement of his left hand. She speculated that it may have been near M.A.'s stomach or leg. She confirmed that the Defendant was very angry at the children and specifically at M.A. She recalled that M.A. appeared frightened.

Christopher Odle, a Bristol Tennessee Police Department ("BTPD") officer, testified that he met with Ms. Berry on the night of September 30, 2016, about a child abuse allegation. Ms. Berry showed Officer Odle a video of the alleged incident on her cell phone. The recording was saved to an app, and Officer Odle obtained a copy of the video she showed him. Officer Odle confirmed that the recording shown to the jury had not been altered from the version he first viewed with Ms. Berry.

That same night Officer Odle went to the Defendant's trailer and arrested him. Once the Defendant had been placed inside Officer Odle's police vehicle, Officer Odle read the Defendant the *Miranda* rights, and the Defendant agreed to speak with the officer. The Defendant confirmed that on September 24, 2016, "the children" were at his residence. He identified M.A. as his daughter. The Defendant stated that he did not recall being angry at the kids during that weekend. When Officer Odle asked the

- 3 -

Defendant about the Defendant's actions in the recording, the Defendant stated that "he was probably just playing around."

Danielle Eller, a BTPD child abuse investigator, testified that she was present during an October 7, 2016 Department of Children's Services child and family team meeting where the Defendant made statements about the incident. The Defendant stated that he was taking medication at the time and had been drinking moonshine and beer. The Defendant recalled that Ms. Berry was supposed to have been watching the children, but he was watching them through a baby monitor and saw the children jumping on the bed after he had told them to stop. The Defendant recounted that he went to the boys' bedroom and "just kind of loses it." He explained that his "blood boil[ed]," and "he black[ed] out." The Defendant stated that he did not know what happened "from there." The Defendant also made statements indicating "it was the medication" that caused his behavior. He also stated that he cannot "drink dark liquor" and suggested that Ms. Berry may have "put something in his drink." On cross-examination, when asked if the Defendant denied hurting his children, Officer Eller responded "he said he didn't know what happened. . . . He blacked out."

The defense called Tammy Addair, the Defendant's mother, as a witness. Ms. Addair confirmed that she cared for the Defendant's children during the work week because the Defendant worked out of town as a lineman for a power company. Ms. Addair picked up the children the day after the alleged incident and did not observe any marks or cuts on M.A. Ms. Addair recalled that M.A. exited the Defendant's trailer holding the Defendant's hand and told him that she loved him. She described this interaction as "typical" for the Defendant and M.A. Ms. Addair identified the man in Ms. Berry's video recording of the incident as the Defendant and the child as M.A. She said that M.A. weighed approximately twenty-two pounds at the time of the video recording.

Edward Willey, a licensed physician in Michigan and Florida, testified as an expert witness in the field of forensic medicine. Dr. Willey reviewed some of the evidence related to this case. Based upon his review of the video recording, Dr. Willey stated that he did not observe a cut, abrasion, bruise, burn or disfigurement on M.A. as required by the statutory definition of bodily injury. Dr. Willey further stated that he did not observe any impairment to the victim. As to the Defendant's hand around the victim's throat, Dr. Willey stated that the Defendant did not obstruct the airway based upon the pitch of M.A.'s "screaming." The doctor then eliminated physical pain as being present in this case because "in order to recognize pain, you'd have to see some sort of injury that you think is likely to produce pain." He concluded stating, "I don't see any injury; therefore, I don't see any demonstration of pain." Dr. Willey explained that M.A. was crying because she was "very substantially rebuked." Dr. Willey testified that he

saw no signs of the child being startled as a possible explanation for her crying. He suggested that the redness on M.A.'s face was likely due to flushing produced by crying.

On cross-examination, Dr. Willey agreed that one could suffer pain that would not be demonstrated through a cut, abrasion, bruise, or physical mark. He acknowledged that pressing on M.A.'s throat could cause pain but stated "I don't recognize that he's pressing on the throat very aggressively." Although denying that it was probable in this case, Dr. Willey agreed that it was possible for someone who had their throat constricted to display signs of redness on their face.

The Defendant testified that, on September 24, 2016, he had been sick with an infection and spent the day in bed sleeping. He said that he kept the baby monitor on at all times when his children were at his home. He explained that Ms. Berry was supposed to be watching the children, but she was not and he observed the children jumping off the bunk bed through the baby video monitor. At one point he "hollered at them" to stop jumping off the bunk bed, but the children continued, so he walked back to the bedroom. As he opened the door, he saw M.A. "mid-jump off the corner of the bunk bed," caught her, and pushed her against the wall because he did not "have a good hold on her." The Defendant denied placing any pressure on her throat or trying to harm M.A. He said he took M.A. to her bed and all the children went to bed. He stated, "[S]he was fine with me the next day." The Defendant said that he did not use force in holding M.A. against the wall because his left arm was resting underneath her "where all her weight was at." He again denied placing any pressure on M.A.'s neck.

Following the evidence, the trial court convicted the Defendant of child abuse and domestic assault. At the sentencing hearing, the trial court merged the Defendant's conviction for domestic assault into the child abuse conviction and ordered the Defendant to serve three years and six months. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal the Defendant asserts that the evidence is insufficient to support his conviction for child abuse and the trial court abused its discretion in sentencing when it enhanced his sentence and denied an alternative sentence.

### A. Sufficiency of the Evidence

The Defendant contends that there is insufficient evidence to support his conviction for child abuse because the State did not introduce evidence of injury to M.A. He further asserts that the trial court, as the trier of fact, failed to give proper weight to Dr. Willey's expert opinion. The State responds that there was sufficient evidence

presented for a rational trier of fact to conclude that the victim experienced pain.  We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)).  This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)).  In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence.  *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973).  "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'"  *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).  "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence.  *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)).  "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact."  *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).  The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human

atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Child abuse occurs when "[a]ny person knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury . . .; provided, however, that, if the abused child is eight (8) years of age or less, the penalty is a Class D felony." T.C.A. § 39-15-401(a). Injury includes cuts, abrasions, bruises, burns, disfigurement, physical pain, temporary illness, or temporary impairment of a bodily function. T.C.A. § 39-11-106(a)(2).

The evidence, viewed in the light most favorable to the State, shows that, on the night of September 24, 2016, the Defendant was at his home with Ms. Berry, Ms. Berry's two children, and the Defendant's two children. The children were in the "boys' bedroom" while the Defendant, who was ill, was resting in his room. The Defendant had drunk some alcohol and also taken medication. He told the children to stop jumping off the bed and returned to his room. When the children continued playing in this manner, the Defendant "stormed down the hall" and "los[t] it." He picked three-year-old M.A. up off the ground and held her against the wall at eye level with his hand around her throat. In the video recording taken by Ms. Berry, the child was red-faced, crying, and her face was contorted consistent with someone in pain. The Defendant then carried M.A. to her bedroom and returned to the boys' bedroom to continue yelling at the children. He could be heard on the recording yelling, "I'm in a g*****n f***ing mood to put some asses on the floor!" Based upon this evidence, we conclude that a rational trier of fact could conclude that the Defendant's grip around the child's neck as he held her to the wall caused the child physical pain. M.A.'s physical response, captured in the video recording, also supports this conclusion.

As to the Defendant's assertion that the trial court erred by discounting Dr. Willey's testimony, we reiterate that this Court does not re-weigh or reevaluate the evidence or substitute our inferences for those drawn by the trier of fact from the evidence. *Matthews*, 805 S.W.2d at 779; *Buggs*, 995 S.W.2d at 105. The trier of fact

resolves all questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence. *Bland,* 958 S.W.2d at 659. The trial court did not abuse its discretion when it relied on the video evidence to find M.A. was in pain. As such, we will not disturb the verdict on this basis.

Accordingly, we conclude that a rational trier of fact could find, beyond a reasonable doubt, that the Defendant knowingly caused three-year-old M.A. physical pain when he held her against the wall at eye level with his left hand closed around her throat. The Defendant is not entitled to relief as to this issue.

## B. Sentencing

The Defendant asserts that the trial court erred in sentencing when it misapplied enhancement and mitigating factors and when it denied an alternative sentence. The State responds that the record supports the trial court's decisions with regard to the application of enhancement and mitigating factors and its decision to deny an alternative sentence in this case. We agree with the State.

Appellate review of sentences is under the abuse of discretion standard with a presumption of reasonableness. *State v. Bise,* 380 S.W.3d 682, 708 (2012); *see also State v. Caudle,* 388 S.W.3d 273, 278-79 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer,* 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore,* 6 S.W.3d 235, 242 (Tenn. 1999)).

To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*.; *State v. Grear,* 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp,* 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise,* at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708. We are also to recognize that the defendant bears "the burden of showing that the sentence is improper." *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991).

## 1. Enhancement and Mitigating Factors

In considering enhancement and mitigating factors, the trial court found applicable: (1) the Defendant had a history of criminal convictions or behavior; (2) the victim was particularly vulnerable due to her young age; and (3) the Defendant abused a position of trust. T.C.A. § 40-35-114(1), (4), and (14). The trial court declined to apply mitigating factor (1), that his conduct did not threaten serious bodily injury and mitigating factor (11), the circumstances of the incident are so unusual that it is unlikely that a sustained intent to violate the law motivated his conduct. T.C.A. § 40-35-113(1) and (11).

"[T]he trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). The trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

We conclude that the trial court properly sentenced the Defendant. The trial court considered the relevant principles and sentenced the Defendant to a within range sentence. The evidence supports the trial court's application of enhancement factors (1), (4), and (14). T.C.A. § 40-35-114. The record shows that the Defendant had multiple DUI convictions at the time of sentencing, supporting the trial court's application of enhancement factor (1). M.A.'s dependence on the Defendant as her father, her young age (three years old) and small size (twenty-two pounds) in relation to the Defendant as an adult, sufficiently establishes her vulnerability as a toddler in this incident. Finally, as to enhancement factor (14), that the Defendant abused a position of trust, we note that our courts have found that a parent/child relationship sufficiently establishes a position of trust for purposes of this enhancement factor. *See State v. Jones*, 953 S.W.2d 695, 699 (Tenn. Crim. App. 1996); *State v. Hayes*, 899 S.W.2d 175, 187 (Tenn. Crim. App. 1995). We similarly conclude that, based on the evidence, the trial court did not abuse its discretion when it declined to apply mitigating factors (1) and (11). To the extent that the Defendant complains about the weight afforded these enhancement and mitigating factors, we reiterate that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 346. The Defendant is not entitled to relief as to this issue.

## 2. Alternative Sentencing

The trial court considered the Defendant's criminal history, but noted that the convictions were from "some time ago." The trial court then recounted the specific facts of the Defendant's conduct toward his three-year-old daughter. The trial court considered heavily the Defendant's lack of remorse in this case as evidenced by statements made on December 8, 2017, accusing his ex-wife and Ms. Berry of a "set-up" as the cause of his arrest. The trial court observed that the Defendant had shown no "empathy towards the three-year-old biological daughter in any way whatsoever." The trial court stated that it "could see the anger brimming just below the surface" during the Defendant's testimony at the sentencing hearing. The trial court opined that the Defendant was "more angry about the circumstances, about being here, than you seem concerned for [M.A.]" The trial court recalled testimony from the Defendant's minister during the sentencing hearing. The minister testified that the Defendant had told him that "there was a video of it that made it look worse than it was." The trial court noted that the Defendant had a good support system and had since stopped drinking but ultimately concluded that, based upon the circumstances of this case and the Defendant's lack of remorse, the Defendant should serve his sentence in confinement.

With regard to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. T.C.A. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he or she is a suitable candidate for probation. T.C.A. § 40-3-303(b); *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Bingham*, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. *Bingham*, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis considering "the nature of the offense and the totality of the

circumstances . . . including a defendant's background." *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (quoting *State v. Moss*, 727 S.W.2d 229, 235 (Tenn. 1986)). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103. We also observe that a defendant's lack of remorse has "a direct bearing on his prospects for rehabilitation." *State v. Richerson*, 612 S.W.2d 194, 196 (Tenn. Crim. App. 1980).

The record supports the trial court's findings in this case. From the time of his arrest, the Defendant, either explicitly or through innuendo, failed to take responsibility for his actions. He blamed alcohol, medication, suggested Ms. Berry had put something in his drink, noted that Ms. Berry was "supposed" to be watching the kids rather than him, accused Ms. Berry and his ex-wife of setting him up, and claimed to have blacked out having no awareness of his conduct. The Defendant justified his actions on the basis that M.A. "was fine with [him] the next day." He expressed a lack of remorse and inability to understand that his actions were not justified, which show his lack of potential for rehabilitation. Accordingly, the trial court did not err when it denied the Defendant an alternative sentence. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE